UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHAN K. LUMBARD,

               Plaintiff,

v.

ST. JOSEPH COUNTY
SHERIFF DEPARMENT, *et al.*,

               Defendants.

_____/

Case No. 1:15-cv-1013

Hon. Gordon J. Quist

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought pursuant to 42 U.S.C. § 1983 by plaintiff Nathan Lumbard, a state prisoner at a Michigan Department of Corrections (MDOC) facility. This matter is now before the Court on a motion for dismissal on the pleadings, or alternatively, for summary judgment (ECF No. 122) filed by defendants St. Joseph County Sheriff's Department, Sheriff Balk, Undersheriff Lillywhite, Capt. Schuler, and NP Kane (ECF No. 122); a motion for summary judgment filed by defendants Mark Boomershine, P.A. and Corizon Health, Inc. (ECF No. 123); a motion for summary judgment filed by defendant Glendora Greene, M.D. (ECF No. 127), and plaintiff's motion for leave to file an amended complaint (ECF No. 139).

### I.      Background

Plaintiff is currently incarcerated at the Michigan Department of Corrections ("MDOC"). However, the claims alleged in his complaint arose at the St. Joseph County Jail ("Jail"), Federal Correctional Institution ("FCI") Ashland, and the MDOC Reception and Guidance Center ("RGC"). At the heart of this lawsuit is plaintiff's claim that defendants were

1

deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, resulting in a delayed diagnosis and treatment of multiple sclerosis ("MS").[1] Plaintiff also alleged that he was mistreated at the Jail.

Plaintiff's criminal history is relevant to understanding the timeline of his claims and some of his reported medical conditions.   On June 24, 2009, plaintiff was arrested by state authorities in Michigan and released on bond. *United States v. Lumbard*, 706 F.3d 716, 719 (6th Cir. 2013). In July 2009, a St. Joseph County Sheriff's Deputy attempted to arrest plaintiff pursuant to another warrant, but he fled and evaded arrest.   *Id.*   Plaintiff used another person's name, birthdate and social security number to obtain a driver's license and United States Passport.   *Id.* Plaintiff faked his death, flew to Tokyo, and later traveled to Thailand and Burma.   *Id.*

> In January 2011, Lumbard was located by the U.S. Department of State Diplomatic Security Service in Burma. They informed Burmese officials that Lumbard was traveling under an assumed name and requested authorities arrest him. Burmese officials arrested him in January 2011 and returned him to United States custody. According to a field report prepared by the Diplomatic Security Service, Lumbard told Burmese officials to transport him to Bangkok rather than the United States, and attempted to stab a Burmese officer with an improvised knife when they refused. Lumbard was then escorted by some twenty Burmese officers to the airport, with Lumbard screaming he was being kidnapped.

*Id.* at 720.   Upon his return to the United States, plaintiff pled guilty to federal charges of making false statements in a U.S. passport application and aggravated identity theft, and was sentenced to

---

[1]  "MS is an autoimmune disease in which the immune system attacks the myelin (protective sheath) that covers nerve fibers and causes communication problems between the brain and the rest of the body. Signs and symptoms of MS vary widely and depend on the amount of nerve damage and the nerves affected. Symptoms include numbness or weakness in the limbs, partial or complete loss of vision, prolonged double vision, tingling or pain, tremor, unsteady gait, slurred speech, fatigue, dizziness, and problems with bowel or bladder function. There is no cure for MS."   Dr. Jeffery Bomber Aff. (ECF No. 60-2, PageID.446). "Mr. Lumbard has been diagnosed with relapsing-remitting MS ('RRMS'), the most common form of MS," which "is characterized by clearly defined attacks of new or increasing neurological symptoms (called relapses or exacerbations), followed by period of partial or complete recovery (remission)."   *Id.*   "RRMS is treated with 'disease-modifying' therapies which reduce progression and symptoms of MS. These therapies do not cure MS but, rather, reduce the number and severity of relapses and slow the progression of the disease." *Id.*

48 months imprisonment.  *See United States v. Lumbard*, 1:10-cr-388 (Judgment) (W.D. Mich. Feb. 10, 2012) (ECF No. 41).

Plaintiff was incarcerated at FCI Ashland.   On June 10, 2013, the Federal Bureau of Prisons ("FBOP") transferred plaintiff to the Jail, where he remained for about eight months. After his release, plaintiff was convicted of felonies in St. Joseph County and sentenced to a term of 5 years, 11 months, to 15 years imprisonment on February 7, 2014.[2]  Plaintiff was returned to the FBOP on February 11, 2014.   Plaintiff was incarcerated at FCI Ashland until July 8, 2014, when he was transferred to the custody of the MDOC to serve the sentences on his state convictions.

Plaintiff alleged that all of his custodians were deliberately indifferent to his serious medical needs.   With respect to his medical treatment at the federal level, plaintiff named the FBOP and FCI Ashland Medical Director Kenneth Gomez.   At the state level, plaintiff named the MDOC, Corizon Health Care ("Corizon"), and PA Boomershine (collectively referred to as the "MDOC defendants").   Finally, at the local level, plaintiff named: the St. Joseph County Sheriff's Department ("Sheriff's Department"); Sheriff Brad Balk [listed as "Bulk" on the docket sheet]; county employees Undersheriff Mark Lillywhite; Captain Tim Schuler; N.P. Patty Kane [listed as "Jail Nurse" on the docket sheet] (collectively referred to as the "St. Joseph County defendants"); and, the County's mental health consultant, Dr. Glendora Green.

The Court previously summarized plaintiff's civil rights claims as follows:

Plaintiff was convicted of federal offenses in 2012 and sent to FCI Ashland to serve his sentence.   On March 25, 2013, Plaintiff was seen by health care for the sudden onset of blurred and double vision, accompanied by headaches. Plaintiff alleges that Defendant Gomez referred him to an optometrist, but Plaintiff never

---

[2] *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=878389 .

received the appointment. Three months later, Plaintiff was transferred on a writ to the St. Joseph County Jail. Upon his arrival, Plaintiff informed Defendant Kane of his deteriorating vision, which had not been addressed, and asked for aspirin to treat his headaches. Kane told Plaintiff that she would inform Dr. Green of Plaintiff's vision problem and refused his request for aspirin because she "[runs] a drug free facility." (Compl. ¶3, ECF No. 1, Page ID#5.) Plaintiff made several requests over the next four months to see a doctor, which were ignored. After intervention by Plaintiff's mother and his attorney, he was seen by an opthamologist on November 5, 2013. By that time, Plaintiff was experiencing tremors and loss of vision in his right eye. The opthamologist reported that Plaintiff's symptoms were not related to his eyes and recommended that he see a doctor.

Plaintiff continued to make requests to see a doctor, which were ignored or denied.  In December 2013, Defendant Kane removed Plaintiff from his cell, stating "since you want to play sick and have your mother call up here, you can go up front, I'm not going to have a worried mother on my hands." (Compl. ¶6, ECF No. 1, Page ID#6.) According to Plaintiff, he was moved to the drunk tank, which was filthy and overcrowded. Inmates slept on mats on the floor and Plaintiff often went six days or more without showers. Plaintiff's attorney spoke with Defendant Kane on the telephone twice in December and asked for Dr. Green to call him. Dr. Green never saw Plaintiff or called his attorney. Plaintiff wrote grievances regarding the cell conditions and the failure to provide him with a doctor. On December 27, 2013, Defendant Kane told Plaintiff that she would make an appointment with a neurologist within 72 hours, but failed to do so. In response to Plaintiff's grievance regarding the cell conditions, Defendant Schuler stated, "You were placed up front per Undersheriff, [sic] myself until further notice. It is our decision as to when you will be moved back [to the general population]. This is for officers to keep an eye on you as you have some medical needs and safety." (Compl. ¶9, ECF No. 1, Page ID#7.) With regard to a doctor, Schuler responded, "If you need to see a specialist, it doesn't happen overnight. I will forward a copy of this to medical." (Compl. ¶9, ECF No. 1, Page ID#7.)

Plaintiff was attacked by another inmate in the drunk tank and moved to isolation. He alleges that he started a hunger strike in order to be seen by a doctor. Defendant Schuler came to Plaintiff's cell and agreed to let Plaintiff see a doctor if he ended the hunger strike. Defendant Kane told Plaintiff that he would have to pay the cost of any tests before they would be performed. Plaintiff filed a grievance regarding the matter and Plaintiff's attorney again intervened on his behalf. Plaintiff was sent for an MRI on January 31, 2014. The conclusions were as follows:

> 1) Numerous punctate and patchy hyperintensities in the cerebral white matter tracts and pons.

2) The differential includes demyelination (consistent with family history) but also includes vasculitis, lime disease, or other white matter pathologies. Please correlate with neurological exam and laboratory findings.

(Compl. ¶11, ECF No. 1, Page ID#8.) The neurologist ordered additional tests, which were never performed.

Plaintiff was returned to FCI Ashland in February of 2014. Despite being unable to walk without assistance, Plaintiff was not provided with any special accommodation for a wheelchair or walker and was assigned to a top bunk. After numerous falls, Plaintiff was provided with a walker that was not suited for the conditions of the facility. As a result, Plaintiff continued to fall and suffer injuries. Plaintiff also was forced to ascend stairs in order to reach the health services department on the second floor. Plaintiff was diagnosed with Multiple Sclerosis (MS) on June 12, 2014. Dr. Melissa Smith recommended that Plaintiff begin disease modifying therapy as soon as possible to help protect from further MS attacks and disability. Plaintiff alleged that FBOP refused to treat Plaintiff with Tysabri as recommended by Dr. Smith. Plaintiff was prescribed medication for the pain related to his MS, but it was ineffective and caused him to suffer extreme dizziness and headaches. When Plaintiff reported this to health care, they labeled him "noncompliant" and refused to provide further treatment.

Plaintiff was transferred to the custody of the MDOC on July 8, 2014. Plaintiff reported his condition upon arrival at the MDOC Reception and Guidance Center and was seen by Defendant Boomershine on July 22, 2014. Boomershine informed Plaintiff that his current medication, which only treated the symptoms of his disease, was sufficient and that he would not be receiving the disease modifying therapy recommended by Dr. Smith. Plaintiff grieved the matter without success. Plaintiff's condition continued to worsen and he made numerous requests for medical treatment over the next several months. After Plaintiff threatened litigation, he was permitted to see a neurologist on May 5, 2015. Treatment was ordered and Plaintiff began disease modifying therapy for the first time on May 18, 2015.

Plaintiff alleges that as a result of Defendants' deliberate indifference, he is now confined to a wheelchair and suffers from diminished vision, incontinence, numbness in lower and upper extremities caused by spastic paraplegia, cognitive impairment in the form of memory loss, speech difficulty, depression, muscular atrophy, involuntary tremors, etc. Plaintiff contends that timely diagnoses and proper treatment would have mitigated -- if not altogether prevented -- his current state of disability.

Opinion (ECF No. 4, PageID.32-35).   Plaintiff's deliberate indifference claim is based upon the allegation that defendants ignored his MS and that he "received treatment for the first time on May 18, 2015," which was "694 days from the onset of the first symptoms" and "340 days from the date of diagnosis."   Compl. (ECF No. 1, PageID.14).

The Court dismissed plaintiff's claims against the FBOP and MDOC on initial screening.  *See* Order (ECF No. 5).   The Court later granted Dr. Gomez' motion to dismiss.  *See* Order (ECF No. 26). Pursuant to the case management order (CMO), defendants filed dispositive motions.   After a motion hearing on discovery matters, the Court denied the first round of dispositive motions without prejudice, entered an amended CMO which allowed additional discovery by plaintiff and the filing of dispositive motions.   After defendants filed their dispositive motions, plaintiff moved to amend his complaint.

**II.    St. Joseph County defendants' motion for judgment on the pleadings and plaintiff's motion to amend the complaint**

**A.    Legal standard**

The Sheriff's Department, Sheriff Balk, Undersheriff Lillywhite, and Capt. Schuler have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).   A motion for judgment on the pleadings should be brought early in the proceedings. *See* Fed. R. Civ. P. 12(c) ("After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings.").   Here, defendants' motion is essentially a re-filing of their first motion which was denied without prejudice.   *See* Order (ECF No. 102).   "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment" using the same standard that applies to a motion to

6

dismiss under Fed. R. Civ. P. 12(b)(6).   *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal quotation marks omitted).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.   The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.   Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true.   *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).   The Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."   *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).   Finally, *pro se* complaints, like the one filed in this case, "are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed."   *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted).   However, the duty to be "less stringent" with *pro se* complaints does not require this court to conjure up unpleaded allegations.   *Scheid v. Fanny Farmer Candy Shops*, 859 F.2d 434, 437 (6th Cir. l988).

### B.        Sheriff's Department

Plaintiff brought his claims pursuant to 42 U.S.C. § 1983.   "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."   *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

Here, plaintiff claims that the Sheriff's Department violated his Eighth Amendment rights.   Plaintiff's claim fails.   The Sheriff's Department is entitled to judgment under Fed. R. Civ. P. 12(c) because it is not a person subject to suit under § 1983.   *See Hughson v. County of Antrim*, 707 F. Supp. 304, 306 (W.D.Mich.1988) (county sheriff's department and county prosecutor's office are not legal entities capable of being sued). This issue was brought to plaintiff's attention at the motion hearing held on April 24, 2017.   At that time, plaintiff wanted to wait until the Court ruled on a motion to dismiss this defendant, with the expectation that "if the Court dismisses the St. Joseph's County Sheriff's Department they [sic] allow me tolling so I may bring the claim against St. Joseph County itself."   Hearing Trans. (April 24, 2017) (ECF No. 119, PageID.1659-1661).

However, plaintiff did not wait for a Court ruling. Rather, after defendants filed their dispositive motions, plaintiff filed a response in which he concurred with the dismissal of the Sheriff's Department and asserted a claim against St. Joseph County. *See* Plaintiff's Response (ECF No. 141, PageID.3221).   Plaintiff argued that Sheriff Balk and St. Joseph County were liable for the failure to implement health care policies, training and supervision which could have prevented his constitutional violations.

8

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978) the Supreme Court held "that a municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."   As a result, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011).   To demonstrate liability under *Monell*, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy."   *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).   That policy "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983."   *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994), quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

Even if the Court allowed plaintiff to substitute St. Joseph County for the Sheriff's Department,[3] plaintiff's complaint contains no allegations that suggest the County had a policy or custom that caused the injury. At most, plaintiff's complaint attempts to hold the Sheriff's Department (or County) vicariously liable for its employees' actions.

> A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. But, under § 1983, local governments are responsible only for "their own illegal acts." They are not vicariously liable under § 1983 for their employees' actions.

---

3 Plaintiff's claim against Sheriff Balk is treated as a claim against the county.   Under Michigan law, the sheriff and the jail administrator set policies for the county jails which are attributable to the county. *See Rushing v. Wayne County*, 436 Mich. 247, 260, 462 N.W.2d 23 (1990) ("the policies of the sheriff and the jail administrator regarding the operation of the jail were attributable to the county"). *See Marchese v. Lucas*, 758 F.2d 181, 189 (6th Cir. 1985) ("We believe that the relationship between the County and the Sheriff's Department is so close as to make the County liable for the Sheriff's failure to train and discipline his officers").

*Connick*, 563 U.S. at 60 (internal citations omitted).    Accordingly, defendant Sheriff's Department should be dismissed from this action.

### C.    Sheriff Balk, Undersheriff Lillywhite, and Capt. Schuler

Defendants Sheriff Balk, Undersheriff Lillywhite, and Capt. Schuler contend that they are entitled to judgment on the pleadings because plaintiff did not allege that they were personally involved in any constitutional violations.    "Personal involvement is necessary to establish section 1983 liability."    *Murphy v. Grenier*, 406 Fed.Appx. 972, 974 (6th Cir. 2011). "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions."    *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). . . "Section 1983 liability will not be imposed solely upon the basis of respondeat superior. . . At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

### 1.    Sheriff Balk

Plaintiff's complaint did not allege that Sheriff Balk was personally involved in a constitutional violation or that the Sheriff set any policy that injured plaintiff.    Accordingly, Sheriff Balk's motion for judgment on the pleadings should be granted.

### 2.    Undersheriff Lillywhite

Similarly, plaintiff does not allege that Undersheriff Lillywhite was personally involved in a constitutional violation.    The only reference to Lillywhite is in a grievance response in which Captain Schuler stated that plaintiff was placed "up front per Undersheriff, myself. . . This is for officers to keep an eye on you as you have some medical needs and safety."    Compl.

(ECF No. 1, PageID.7).   This cursory reference to Undersheriff Lillywhite is insufficient to state a cause of action for a federal constitutional violation.   *See Iqbal*, 556 U.S. at 678.   Accordingly, Undersheriff Lillywhite's motion for judgment on the pleadings should be granted.

### 2.    Capt. Schuler

### a.    Capt. Schuler's response to grievances

With respect to Capt. Schuler, plaintiff referred to grievances that he wrote on January 2, 2014, "regarding the conditions in which he was being held and the jail's refusal to let him be seen by a doctor, that Nurse Kane informed him on 12-27, 2013, that she would have an appointment made within 72 hours and that Plaintiff had spoke with Nurse Kane on 1-2-2014, and still no appointmen[t] had been made."   Compl. at ¶ 9 (ECF No. 1, PageID.7).   With respect to "grievance #1," Capt. Schuler responded on January 8, 2014, "You were placed up front per Undersheriff, myself til further notice.   [I]t is our decision as to when you will be moved back. This is for officers to keep an eye on you as you have some medical needs and safety."   *Id*.   With respect to "grievance #2," Capt. Schuler responded on January 8, 2014, "If you need to see a specialist, it doesn't happen overnight.   I will forward a copy of this to medical."   *Id*.

These allegations do not allege a claim against Capt. Schuler.   A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).   "The mere denial of a prisoner's grievance states no claim of constitutional dimension."   *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003).   *See Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the actual denial of a request to receive medical care).

11

### b.    Capt. Schuler's visit to plaintiff's cell

Plaintiff alleged that "Captain Tim Schuler came to Plaintiff's cell and agreed to let Plaintiff see a doctor if he ended a hunger strike which he had already been on for five days." *Id.* at ¶ 10 at PageID.7-8.   This cursory allegation does not state a cause of action.   While the pleading standard announced in Fed. R. Civ. P. 8 does not require detailed factual allegations, "it demands more than an unadorned, the - defendant - unlawfully - harmed - me accusation." *Iqbal*, 556 U.S. at 678.

### c.    Failure to protect

Plaintiff alleged that he "was attacked by another inmate while being held in the 'drunk tank.'" *Id.* at ¶ 10 at PageID.7.   Plaintiff's allegation that another inmate attacked him is insufficient to allege an Eighth Amendment violation.   The Supreme Court has held that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).   An Eighth Amendment violation may occur when prison guards fail to protect one inmate from an attack by another inmate. *See Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990).   However, "not all injuries suffered by an inmate at the hands of another prisoner result in constitutional liability for prison officials under the Eighth Amendment." *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998). To establish an Eighth Amendment claim that a prison official failed to protect an inmate, the inmate must show that the official was deliberately indifferent "to a substantial risk of serious harm" to the inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004). "To demonstrate deliberate indifference, an inmate must present evidence from which a trier of fact could conclude

'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene*, 361 F.3d at 294, quoting *Farmer*, 511 U.S. at 829, 847.   Generally, an isolated or occasional attack is insufficient to state an Eighth Amendment claim.  *See Stewart v. Love*, 696 F.2d 43, 44 (6th Cir. 1982).   Plaintiff's allegation that another inmate attacked him is insufficient to allege an Eighth Amendment violation.   Accordingly, defendants' motion should be granted on this claim.

### d.    Placement in the "drunk tank"

Plaintiff alleged that he was placed in the "drunk tank," which was "filthy, chaotic, and overcrowded."   Compl. at PageID.6.   Inmates had to sleep on mats on the floor, and plaintiff had to go without a shower for 6 days or more.   *Id.*   "[O]nly deprivations denying 'the minimal civilized measure of life's necessities' are grave enough to create a violation of the Cruel and Unusual Punishment Clause."   *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004), quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   Plaintiff's allegation, which does not identify a defendant or duration of his confinement, is insufficient to state a cause of action.   *See Iqbal*, 556 U.S. at 678; *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ([T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of "grue" might be tolerable for a few days and intolerably cruel for weeks or months.").   Accordingly, defendants' motion should be granted on this claim.

### D.    Plaintiff's motion to amend

After defendants filed their second round of dispositive motions, plaintiff moved for leave file an amended complaint (ECF No. 139).   In his motion, plaintiff stated that he "now seeks to correct errors and pleadings [sic] contained within the Complaint," specifically plaintiff

did not know Corizon's policies, practices or customs before discovery and he "merely seeks to amend his complaint in respect to Defendant Corizon, to assert the necessary allegations supported by facts now known to Plaintiff, to perfect his Complaint and meet statutory pleading requirements."  Motion to amend at PageID.2533-2534.  Given plaintiff's statement, it would appear that he filed this lawsuit against Corizon without any basis in law or fact.   Then, plaintiff's motion expands to a discussion of facts discovered during the depositions of the St. Joseph County Defendants.  *Id.* at PageID.2234-2235.   Presumably, plaintiff wants to file an amended complaint to avoid dismissal on the motion for judgment on the pleadings.   Plaintiff's motion states that he attached both a proposed amended complaint (Exhibit A) and supporting case law (Exhibit B). *Id.* at PageID.2535.   However, plaintiff attached neither. Because plaintiff did not file a proposed amended complaint, *see* discussion *infra*, the Court cannot ascertain the specific claims that plaintiff desires to bring.

Defendants oppose the motion as deficient, untimely, and prejudicial.   Fed. R. Civ. P. 15(a)(2) provides that a party may amend its pleading only with the court's leave and that "[t]he court should freely give leave when justice so requires."   "Justice may not require leave to amend, however, in cases of undue delay, prejudice to the nonmovant, bad faith, dilatory motive, or where the proposed amendment is futile."  *Siegner v. Township of Salem*, 654 Fed. Appx. 223, 228 (6th Cir. 2016), citing *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In order for a court to determine whether "justice so requires" a particular amendment, "the court must have before it the substance of the proposed amendment."  *Roskam Baking Co. v. Lanham Machinery Co.*, 288 F.3d 895, 906 (6th Cir. 2002).   Here, there is nothing for the Court to review.   Plaintiff's failure to attach a proposed amended complaint is a sufficient

14

ground for denial.  *See Fields v. Gerth*, No. 2:13-cv-310, 2015 WL 2062068 at *5 (W.D. Mich. May 4, 2015) ("[t]he court does not abuse its discretion by denying an amendment where the plaintiff has failed to submit a proposed amended complaint").

In addition, plaintiff's motion for leave to file an amended complaint is untimely. The CMO required that all pre-trial motions be filed not later than December 12, 2016.  *See* CMO (ECF No. 27).   On April 24, 2017, the Court held a hearing to address outstanding discovery disputes.   After the hearing, the Court entered an order which allowed plaintiff to engage in additional discovery and required that all dispositive and non-dispositive pre-trial motions be filed by no later than July 17, 2017.  *See* Amended CMO (ECF No. 103).   Plaintiff did not file his motion to amend before that deadline.   Rather, he moved for an enlargement of time to file responses and pre-trial motions.   Ultimately, the Court granted plaintiff's motion in part, allowing plaintiff to file motions for summary judgment by no later than October 6, 2017.   Order (ECF No. 137).   This order did not authorize another extension of time to amend the complaint. Accordingly, plaintiff's motion to amend was filed about three months late.[4]

In addition, defendants will be prejudiced if plaintiff is allowed to amend his complaint.  *See Prater v. Ohio Education Association*, 505 F.3d 437, 445 (6th Cir. 2007) (the Sixth Circuit requires "at least some significant showing of prejudice to deny a motion to amend based solely upon delay") (internal quotation marks omitted).   Courts have found that "allowing amendment after the close of discovery creates significant prejudice."  *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (citing cases).  *See Seigner*, 654 Fed. Appx. at 228 ("Allowing an amendment after discovery is closed and summary judgment motions are 'fully

---

4 In this regard, the Court notes that while plaintiff's motion was dated September 27, 2017, it was not postmarked until more than two weeks later on October 13, 2017.

briefed' imposes significant prejudice on defendants."). In addition, "[w]hen amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utilities Board*, 259 F.3d 452, 459 (6th Cir. 2001).

In *Burland v. Bradshaw*, No. 1:16-cv-983, 2017 WL 2964720 (W.D. Mich. April 28, 2017), this Court explained the problems inherent in filing a motion to amend a complaint after the close of discovery:

> Plaintiff delayed pursuing this claim until after the discovery deadline had passed, instead choosing to file its motion for leave to amend at the same time Defendants filed their motion for summary judgment. But beyond this delay, adding the additional claim would require identification of new witnesses, supplementing existing and taking new depositions, in addition to new discovery, over two months after discovery has closed. If the Court would allow amendment, Defendants would face the significant prejudice of having to defend against a claim without the benefit of court-supervised discovery. To prevent this prejudice, the Court would need to alter the scheduling order to accommodate additional discovery and possible dispositive motions.

*Burland*, 2017 WL 2964720 at *5 (internal citation omitted).

Here, plaintiff was put on notice that the allegations in his complaint were arguably deficient back in December 2016, when defendants filed their initial rounds of dispositive motions. *See Jackson v. Boatman*, No. 4:06-cv-75, 2007 WL 2320531 at *4 (W.D. Mich. Aug. 10, 2007) (defendant's previously filed motion for summary judgment "should have alerted [p]laintiff to any need to amend the complaint"). Defendants' motions and briefs gave plaintiff something of a road map for curing the alleged deficiencies. However, plaintiff chose to proceed with his claims, even after the Court noted at the April 24, 2017 hearing that his claim against the Sheriff's Department would likely be dismissed. Finally, plaintiff knew that he needed to submit a proposed amended complaint and a supporting brief, but failed to do so. In this regard, the Court denied plaintiff's first motion to amend the complaint because he failed to submit a copy of the

16

proposed amended complaint and provided no legal basis for adding 27 new claims to this case.

Order (ECF No. 100).   For these reasons, plaintiff's motion to amend should be denied.

### III.    St. Joseph County defendants' motion for summary judgment

### A.    Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.   Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).   "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."   *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).   However, the Court

is not bound to blindly adopt a non-moving party's version of the facts.   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.  Qualified Immunity

The St. Joseph County defendants framed their motion as one brought on the basis of qualified immunity.   Under this affirmative defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, -- U.S. --, 135 S. Ct. 348, 350 (2014).

> Where a defendant moves for summary judgment based on qualified immunity, the plaintiff must first identify a clearly established right alleged to have been violated and second, establish that a reasonable officer in the defendant's position should have known that his conduct violated that right.  The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct.

*Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (internal citations omitted). Defendants have not met their initial burden of coming forward with facts to suggest that they acted within the scope of their discretionary authority during the incidents in question.

18

*Gardenhire*, 205 F.3d at 311.   Nor do defendants set forth any facts that they made "reasonable but mistaken judgments" which would be shielded by qualified immunity.   *Carroll*, 135 S. Ct. 348 at 350.   Rather, defendants are simply moving for summary judgment because "plaintiff cannot establish that any of the St. Joseph County individually named Defendants violated his constitutional rights."   St. Joseph County defendants' Brief (ECF No. 124, PageID.1910). Accordingly, this Court will address defendants' motion as seeking summary judgment on the merits of plaintiff's claims.

### C.    Eighth Amendment claims

### 1.    NP Kane

NP Kane was the health care provider at the Jail.   For the reasons stated below, the Court concludes that NP Kane should be granted summary judgment on plaintiff's claim that she was deliberately indifferent to his serious medical needs.   It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.   *Estelle v. Gamble*, 429 U.S. 97 (l976).   A viable Eighth Amendment claim consists of an objective and a subjective component.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.   *Hudson*, 503 U.S. at 8.   The objective component requires the infliction of serious pain or failure to treat a serious medical condition.    *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care,

deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319.

As an initial matter, NP Kane points out that contrary to the allegations in his complaint, plaintiff was not transferred directly from FCI Ashland to the St. Joseph County Jail. Rather, plaintiff arrived from the LaGrange County Jail in Indiana:

> In his complaint, Plaintiff alleges he was transferred from F.C.I. Ashland to the St. Joseph County Jail on June 23, 2013. Dkt. No. 1, at ¶3, Page ID.5. However, at Plaintiff's deposition, he admitted this was not accurate. Plaintiff was transferred from F.C.I. Ashland to the LaGrange County Jail in LaGrange, Indiana. (**Ex 1**, Pl dep at 26-27) Plaintiff was in the LaGrange County Jail for 30-40 days. (*Id.*) Plaintiff did not make any complaints or requests for medical services related to his blurry or double vision while in LaGrange County Jail. However, he did complain about a toe infection, which resulted in the LaGrange County Jail medical staff placing him on an antibiotic. He made no other medical complaints or requests while in LaGrange. (*Id.* at 29-32) Plaintiff claims he had vision issues while in LaGrange, but chose not to report them. (*Id.* at 42)

St. Joseph County defendants' Brief (ECF No. 124, PageID.1900) (emphasis in original). Plaintiff was transferred from the LaGrange County Jail to the St. Joseph County Jail on June 10, 2013.  *Id.* citing Booking Record (ECF No. 124-3, PageID.1947).

These records are significant because they demonstrate the inaccuracy of plaintiff's timeline alleged in the complaint (i.e., he was not transferred directly from FCI Ashland to the Jail), and the records from Indiana identified only two matters in plaintiff's medical/mental health history which he disclosed to the authorities in Indiana, i.e., anxiety and toe nail fungus.  *See* Summary of Indiana County Jail Medical Records (ECF No. 128-3, PageID.2047).[5]

Plaintiff's initial medical screening questionnaire, which he signed during the book-in process at the Jail, did not indicate that he had any disabilities or issues requiring special needs. Medical Questionnaire (ECF No. 124-4).    Plaintiff denied recently seeing a doctor "for any illness." *Id.*    Plaintiff stated that he was supposed to be taking medication for "a mental/emotional condition," that he was "presently taking medication," and that he suffered from seasonal allergies. *Id.*

On June 24, 2013, NP Kane conducted a medical intake review of plaintiff, noting that he had anxiety and a toe infection ("fungal nails").    Medical Intake (ECF No. 124-5).    At that time, plaintiff denied any family history of illness.    *Id.*    However, this statement is incorrect; at his deposition plaintiff testified that his sister was diagnosed with MS in 2005.    Plaintiff's Dep. (ECF No. 123-1, PageID.1813).    On examination, NP Kane noted that plaintiff wore glasses but

---

[5] While this record was attached to Dr. Greene's motion for summary judgment, it is relevant to plaintiff's claims against all defendants.

was otherwise normal.   Medical/Mental Exam (ECF No. 124-6); Plaintiff's Dep. (ECF No. 124-2, PageID.1933-1934).

On August 6, 2013, plaintiff sent NP Kane a medical note concerning a conversation they had regarding medication, in which plaintiff stated that he decided to stay on Prozac but wanted to discontinue Terbinafine (fungal infection medicine).   Note (Aug. 6, 2013) (ECF No.124-7, PageID.1955).

At some point in time, plaintiff sent NP Kane an undated letter requesting that she look at the optic nerve in his right eye, that he had lost nearly all of the vision in his eye, that he was seen by doctors at the prison for deterioration of his vision, that they referred him to a specialist, but that he was brought to the Jail before seeing the specialist.   *See* Plaintiff's undated letter (ECF No. 124-8, PageID.1957). The letter made no reference to plaintiff experiencing problems or requesting treatment while incarcerated in Indiana.   There are two groups of handwritten notes at the bottom of the letter with NP Kane's initials: "11/5/13 12:45," "Tomorrow 1300," and "need nurse[?]"; and, "11/18/13 call for office rate".   *Id.* The statements in plaintiff's letter that his vision was so deteriorated that prison doctors referred him to a specialist contradicted the medical history plaintiff gave to NP Kane that he was not being treated for any illness.

On or about November 4, 2013, Dr. Greene (the Jail's Mental Healthcare Consultant), scheduled a referral to ophthalmologist Aresenio Parial, M.D.   Dr. Greene Aff. (ECF No. 128-19, PageID.2100).   Dr. Greene scheduled this referral after a telephone discussion with NP Kane about a complaint Kane received on November 4th "about visual blurring from the Plaintiff."   *Id.*   Plaintiff had an eye examination with Dr. Parial the next day.   The results of the doctor's November 5th examination were faxed to the Jail on November 17th.   Eye Exam (Nov.

22

5, 2013) (ECF No. 124-9).   The examination notes are difficult to decipher, although the assessment plan included the phrase "advised to see MD in KY in December," which suggests that plaintiff expected to be back at FCI Ashland by December.   *Id.* at PageID.1961.

On December 16, 2013, NP Kane examined plaintiff regarding a complaint of a "weird gait" which plaintiff experienced since December 6th.   Exam (Dec. 16, 2013) (ECF No. 124-10).   Kane found plaintiff's neuro "normal" with a plan of care which appears to say "observe."   *Id.*   Plaintiff testified that he was taken to a holding cell in December 2013.   Plaintiff Dep. at PageID.1937.

After NP Kane's December 16, 2013 examination, Dr. Greene agreed to come to the jail and "visually examine" plaintiff by looking at him through the window of the front cell. Dr. Greene Aff. (ECF No. 128-19, PageID.2100).   Dr. Greene agreed to do this because NP Kane was unsure of the etiology of plaintiff's complaints of having a difficult time walking and visual problems.   *Id.*   The doctor observed plaintiff on December 19th.   *Id.*   Her findings were inconsistent "because the Plaintiff would be symptomatic when he knew we were watching and he appeared to be fine when we were not watching."   *Id.*

On December 27, 2013, Dr. Greene, on behalf of the "St. Joe County Sheriff's Department," requested a neuro consultation for plaintiff with the following diagnosis, "previous head traum [sic] 2-3 years ago, now has L leg dragging."   Neuro Request (ECF No. 124-11). While this request was pending plaintiff wrote a grievance (dated January 2, 2014) about being held for observation but not receiving medical treatment.   *See* Grievance #1 (Jan. 2, 2014) (ECF No. 124-12) (copy provided largely illegible).   Plaintiff wrote a second grievance on January 2,

2014 to which Capt. Schuler stated that a referral to a specialist "doesn't happen overnight").    *See* Grievance #2 (Jan. 2, 2014) (ECF No. 124-13) (also largely illegible).

On January 10, 2014, plaintiff was involved in a fight with another inmate. Plaintiff admitted that he "head-butted" the other inmate first, claiming it was self-defense.    Plaintiff Dep. at PageID.1939-1941.  Plaintiff had no previous interaction with the other inmate and made no prior complaints that he felt unsafe or at risk.    *Id.*

Borgess Neurologist Dr. Sugandi Sridharan examined plaintiff on January 16, 2014 and issued the following report:

> Mr. Nathan Lumbard came to my office with the 2 present guards for evaluation of blurred vision and unsteady gait for the past several weeks. Patient is a 31 year old male who says he was held captive in Burma 2-3 years ago and feels he may have had head injury then.   Although he cannot recall specific head trauma or loss of consciousness.   About a year ago he developed blurry vision and was prescribed glasses which apparently improved his vision. But then started worsening again and was evaluated in November of last year and was told that there was some abnormality probably behind the eye. I have the ophthalmologists handwritten note which is not very clear to me. Patient also says to [sic] 3 weeks thereafter he developed unsteady gait and had fallen a couple of times. In addition has noted dragging of the left lower extremity. Denied any pain or paresthesias in extremities. Also denied any eye pain or headaches. Claimed he had lost vision in both eyes but was able to read and fill out the medical questionnaire that was given to him in our office.

Dr. Sridharan Report (No. 124-14, PageID.1973).

Although plaintiff did not report a family history of diabetes and multiple sclerosis to NP Kane, he did report this history to Dr. Sridharan. *Id.* at PageID.1975. In reviewing plaintiff's gait, the doctor noted that plaintiff was embellishing his symptoms, i.e., "Patient was holding on to the wall and table when walking – seems there is a significant component of embellishment on exam."  *Id.* at PageID.1976.   The doctor's impression was:

24

31 year old male prisoner with complaints of "visual loss" bilaterally although he is able to read the medical questionnaire and answer the questions without difficulty.   As [sic] unsteadiness and left lower extremity weakness which is hard to elicit on examination.   Would like to proceed with workup to eliminate possibilities.

*Id*. at PageID.1977.   The doctor suggested the following workup: MRI brain without contrast; bilateral visual responses; EMG of the bilateral / left lower extremity; and labs to rule out possible causes of above symptoms.   *Id*.

Dr. Sridharan faxed his report to the Jail on January 20, 2014.   *See* Fax (ECF No. 124-14, PageID.1971).   Plaintiff was scheduled for an MRI, which took place at the Three Rivers Hospital on January 31, 2014, and contained the following conclusions:

1. Numerous punctate and patchy hyperintesities in the cerebral white matter tracts and the pons

2. The differential includes demyelination (consistent with family history) but also includes vasculitis, Lyme disease, or other white matter pathologies. Please correlate with neurological exam and laboratory findings.

3. No acute abnormalities. No visible mass.

4. A post contrast scan is indicated to evaluate for active demyelination. We will attempt to call the patient back and obtain postcontrast scans.

MRI Report (ECF No. 124-15, PageID.1980).   In a letter dated February 3, 2014, Three Rivers Health advised NP Kane that plaintiff needed to schedule an "MRI Brain with contrast."   Letter (Feb. 3, 2014) (ECF No. 124-15, PageID.1979).   On February 5, 2014, Borgess Neurology faxed NP Kane a cryptic message from which it appears that the MRI with contrast was scheduled for [February] "12th 4:30 pm" at Three Rivers Health (although there is a note dated "2/6/15" on the sheet as well).   Fax (Feb. 5. 2014) (ECF No. 124-16).

However, the MRI did not occur on that date, because plaintiff was sent back to FCI Ashland.   An entry in the St. Joseph County Inmate Medical Log reflects NP Kane's February 6, 2014 conversation with plaintiff before he was returned to the federal prison:

> Conversation with Nathan regarding recent MRI results.   Aware of white patches documented and recommendation by the KZOO Neurologist.   Aware of time constraints – is aware of the notification of Federal Prison regarding his health care needs and that all information will accompany him / plus faxed to the Prison Medical unit for physician knowledge should he return to that system.   Aware that appointments will be made from this site as court system indicates.

Inmate Log entry (ECF No. 124-17). NP Kane testified that she spoke with "Lisa" at the federal prison, "about where [plaintiff] was in his process of care and for continuity," made a copy of plaintiff's medical records for hand delivery, and faxed 17 pages of plaintiff's medical records to FCI Ashland.   Kane Dep. (ECF No. 124-20, PageID.1991-1992); Fax Sheet (Feb. 11, 2014). Plaintiff was transported to FCI Ashland on February 11, 2014.   Marshal's Receipt (ECF No. 124-18).

Plaintiff contends that a genuine issue of material fact exists as to when his visual disturbance first became known to defendants, i.e., that NP Kane ignored his requests for treatment prior to the ophthalmology appointment on November 5, 2013.   Plaintiff's response brief states that he advised NP Kane of his visual difficulties during intake and that Kane told him to expect to see the Jail's doctor within two weeks.   Plaintiff's Response (ECF No. 141, PageID.3220).   At his deposition, plaintiff acknowledged that NP Kane performed an eye examination when he informed her of the visual disturbance.   Plaintiff's Dep (ECF No. 57-2 at PageID.348). [6] Plaintiff's only explanation for Kane's failure to document this condition was that "she was rather

---

[6] Plaintiff cites a copy of his deposition transcript filed earlier in the case.

indifferent from the time I entered the jail to the time I left."   *Id*. at PageID.349.   Plaintiff also stated that when Dr. Greene failed to visit him after two weeks, he "made daily requests to see a doctor, all of which remained unanswered", and that "[b]y late October, Plaintiff was experiencing loss of vision, tremors, and dizziness upon walking."   Plaintiff's Response at PageID.3220. However, plaintiff presents no evidence to support these claims other than referring to his "declaration submitted."   *Id*. at PageID.3223.

Plaintiff's claims regarding Dr. Greene's failure to examine him at the jail are contradicted by the record.   As discussed in § IV, *infra*, Dr. Greene was not the Jail's doctor who examined inmates. The doctor was an independent mental health consultant who acted as a liaison with the Jail's medical provider (NP Kane).   *See* Dr. Greene Aff. (ECF No. 128-19, PageID.2099). Under her agreement with the St. Joseph County, Dr. Greene was expressly prohibited from having direct contact with inmates.   *Id*.   Accordingly, Dr. Greene would not have treated plaintiff at the Jail and plaintiff would not have no basis to request to see her for an examination.

Plaintiff does point out NP Kane's testimony that she did not obtain a release of plaintiff's medical records from the FBOP.   *Id*. at PageID.3231; Kane Dep. (ECF No. 138-1, PageID.2188).   He also points out that NP Kane's acknowledgement that there was not a follow-up appointment with an ophthalmologist in December 2013.   Kane Dep. at PageID.2215.

While plaintiff did not attach a "declaration" to his response, the Court has reviewed plaintiff's declaration (ECF No. 140-2, PageID.2789-2794) which he submitted in opposition to defendants Boomershine and Corizon's motion for summary judgment.   In his declaration, plaintiff essentially recites portions of his complaint.   Plaintiff stated that during the intake review "I made known that I had a documented visual disturbance" and was never asked

27

about family illnesses (such as cancer, diabetes, and MS).  Lumbard Decl. at PageID.2790. Plaintiff states that he never saw Dr. Greene (whom he describes as the "Jail's doctor"), that he made daily requests to see a doctor after two weeks, that he never got responses, and that he saw an ophthalmologist on November 5, 2013 only after his mother called the jail.  *Id*. at PageID.2790-2791.  Plaintiff's declaration did not include copies of any documents regarding his daily requests to see a doctor for the five months prior to his ophthalmology examination on November 5, 2013.

The only other evidence presented by plaintiff regarding his alleged delay in seeing the ophthalmologist is a phone message from his mother.  On October 30, 2013, plaintiff's mother called stating that he was scheduled to see a neurologist while in prison but then moved, that he cannot see anything out of his right eye, and that he has tremors on the right side of his body. Telephone Message (ECF No. 141-3, PageID.3270).

Plaintiff also provided a declaration from Zachary Metzger stating that he visited plaintiff at the St. Joseph County Jail between June 2013 and February 2014 and noticed that plaintiff had lost a significant amount of weight and walking with difficulty.  Metzger Decl. (ECF No. 141-3, PageID.3275).  However, Metzger gave no specific dates regarding when he visited the Jail.

A notable portion of plaintiff's response to defendants' motion is an affidavit from a physician, Charles E. Potts, M.D., of Palm Bay, Florida, who was retained by the Law Firm of American Medical Associates, LLC (lawyers who have not appeared in this action) "to determine if FCI Ashland, St. Joseph County Jail, and Corizon Inc., et. Al (Michigan MDOC) and their employees breached the standards of care for reasons evidenced in their documentation."  Potts

28

Aff. (March 15, 2017) (ECF No. 141-1, PageID.3247).[7] Based on his review of unidentified

"pertinent records," the doctor reached the following opinions:

> Based on my education, training, and experience in treating and monitoring as well as working with subspecialists in correctional health care settings caring for patients like Mr. Lumbard, I found that, based upon a reasonable degree of certainty, that FCI Ashland, St. Joseph County Jail, and Corizon Inc, et. Al (Michigan MDOC) deviated from the expected standard of care in the following manner:
>
> **Opinion 1**: Failure to coordinate care between institutions to maintain diagnostic and therapeutic continuity with specialist recommendations to intervene or resolve Mr. Lumbard's complaints.
>
> **Opinion 2**: Failure of Mid-Level Providers to provide or refer to a higher and appropriate level of clinical expertise for evaluation and definitive treatment in a timely manner.
>
> **Opinion 3**: Failure of medical and custody staff to recognize, respond to, and take appropriate action to appropriately provide housing and medical appliances required by a visually impaired and mobility handicapped individual to ensure his physical safety within an institutional setting.
>
> **Opinion 4**: Failure to provide necessary and adequate medical treatment in a timely manner to prevent progression of Mr. Lumbard's disease (Multiple Sclerosis) as indicated in the recommendations of the specialist.

Potts' Aff. at PageID.3249 (emphasis in original).   Based on these opinions, Dr. Potts' concluded

"that Defendants FCI Ashland, St. Joseph County Jail, and Corizon Inc, et. Al (Michigan MDOC)

did not use such care as reasonably prudent healthcare providers practicing in the same field in the

same or similar locality would have provided under similar circumstances."   *Id*.   Aside from the

fact that the Potts' affidavit does not identify either the records reviewed or the individual

defendants, his opinions do not establish deliberate indifference as to any defendant.   At most, the

---

[7] The Court is unaccustomed to the lack of candor demonstrated by plaintiff, who made no mention of retaining Dr. Potts, being represented by a law firm, or obtaining the Potts' affidavit during the April 24, 2017 hearing.

doctor opined that "FCI Ashland, St. Joseph County Jail, and Corizon Inc, et. Al (Michigan MDOC)" were negligent. However, this is not a malpractice action.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 835.

Plaintiff appears to claim that NP Kane was deliberately indifferent for (1) ignoring his complaints of visual problems from his arrival at the Jail until he saw the ophthalmologist on November 5, 2013, and (2) failing to schedule a follow-up appointment in December 2013.   *See* Plaintiff's Response (ECF No. 3223-3224).   Based on this record, the Court concludes that plaintiff has failed to provide "significant probative evidence . . . on which the jury could reasonably find for the plaintiff" with respect to his claim that NP Kane ignored his requests to see an ophthalmologist.    *Copeland*, 57 F.3d at 479.   The Jail records, including the medical questionnaire signed by plaintiff, reflect that plaintiff did not disclose any serious vision problems to NP Kane when he arrived at the Jail.   Plaintiff's explanation for Kane's failure to document his vision problems during her initial examination, i.e., "she was rather indifferent from the time I entered the jail to the time I left," is no explanation at all.   Plaintiff's claim that he made daily requests to see a doctor from some point in June 2013 until November 5, 2013 is not supported by significant probative evidence.   Plaintiff was well-aware of how to file a grievance, yet there is no evidence that he filed one grievance or one kite requesting to see an ophthalmologist.   The only written evidence is an undated letter from plaintiff with notes from NP Kane dated November 2013.   Finally, given plaintiff's medical history as presented to the Jail, e.g., no recent treatment by a physician, NP Kane would have no reason to request plaintiff's medical records from the FBOP.

It is undisputed that NP Kane did not schedule a follow-up appointment in December 2013 as recommended by the ophthalmologist.   While plaintiff saw the neurologist in January 2014, there is no explanation in the record for why a follow-up did not occur with the ophthalmologist.   However, under the facts of this case, the failure to schedule a follow-up appointment did not amount to deliberate indifference. Dr. Greene scheduled the neurologist examination to address plaintiff's symptoms and the neurologist questioned the extent of plaintiff's vision problems.   The neurologist's plan did not include a follow-up with an ophalmologist. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). Accordingly, NP Kane's motion for summary judgment should be granted.

### 2.    Sheriff Balk, Undersheriff Lillywhite, and Capt. Schuler

As an alternative to seeking judgment on the pleadings, these defendants moved for summary judgment on plaintiff's Eighth Amendment claims that they failed to protect him from another inmate and that plaintiff's confinement in the "drunk tank" constituted cruel and unusual punishment.   The Court previously advised defendants' counsel to refrain from filing combined motions seeking relief under Fed. R. Civ. P. 12 and Fed. R. Civ. P. 56 because "[s]uch motions can be unnecessarily difficult to address due to the different legal standards applicable to the motions."   *See* Order (ECF No. 102, PageID.1513).   Counsel did not heed the Court's advice, and once again filed a motion which blurs the standards of review between a motion for judgment on the pleadings under Fed. R. Civ. P. 12 and a motion for summary judgment under Fed. R. Civ.

31

P. 56.   As a preface to their motion for summary judgment, defendants reaffirm that plaintiff has failed to allege any causes of action against them, "As noted above, Plaintiff has made no allegations directly alleging deliberate indifference against Sheriff Balk, Undersheriff Lillywhite, or Captain Schuler on this claim, and as such, he cannot establish the subjective component necessary to sustain such a claim."   St. Joseph County defendants' Brief (ECF No. 124, PageID.1910).   Despite this unequivocal statement, defendants then proceed to argue a motion for summary judgment which is essentially a motion to dismiss, e.g., "Plaintiff seems to allege that because he was suffering symptoms of then-undiagnosed-MS, he was a vulnerable person who should not have been subjected to placement in a cell with other, potentially violent individuals," with some conclusory factual statements added in, e.g., "Plaintiff can present no evidence that any of the individually named Defendants were subjectively aware that Plaintiff was at risk of injury at the hands of other inmates, or that they knew he was actually suffering from MS."   *Id.* at PageID.1917. As discussed, plaintiff's complaint, the pleading which controls this litigation, fails to state a cause of action against these defendants.   Defendants cannot seek summary judgment on a non-existent cause of action.   Accordingly, defendants' motion for summary judgment should be denied.

### IV.    Dr. Greene's motion for summary judgment

Dr. Greene was an independent contractor who agreed to act as the "St. Joseph County Jail Mental Health Consultant" commencing January 1, 2010.  *See* Agreement (Dec. 8, 2009) (ECF No. 128-18, PageID.2093).   Dr. Greene's duties included acting as the "mental healthcare Consultant," advising the Nurse Practitioner and Officers "regarding the initiating, adjustment, or discontinuing of any treatments the inmate has been receiving prior to arriving at

the jail," and to act as a liaison between the Nurse Practitioner, Officers and county staff "and any outside/independent Mental Health service or care providers."   *Id.*   While the doctor had other duties, those are illegible.   *Id.* at PageID.2095.   However, in her affidavit, Dr. Greene stated that one of those conditions included the following, "E. As the county does not have an inpatient psych facility or psychiatrist on staff, Dr. Greene will not provide direct personal counseling or inpatient psychiatric care to the inmates."   Dr. Greene Aff. (ECF No. 128-19, PageID.2099).

As discussed, Dr. Greene scheduled the November 5, 2013 ophthalmology examination within one day of receiving a report of plaintiff's blurry vision.   After NP Kane's December 16, 2013 examination, Dr. Greene agreed to come to the jail where she "visually examine[d]" plaintiff, and then, on December 27, 2013, scheduled the neurology consultation for January 16, 2014.   *Id.* at PageID.2100.

Consistent with the neurologist's (Dr. Sridharan's) recommendation, Dr. Greene arranged an MRI without contrast to be performed at the earliest possible appointment available on January 31, 2014.   *Id.* at PageID.2101.   Dr. Sridharan recommended a contrast MRI of the brain on "2/5/13" [sic].   On February 6, 2014, Dr. Greene "scheduled, with urgency" a contrast MRI for plaintiff which was to occur on February 12, 2014.   *Id.*   However, on February 11, 2014, plaintiff was returned to federal custody in Kentucky.   *Id.*

In his response, plaintiff contends that Dr. Greene did not consider his symptoms seriously.   In this regard, Dr. Greene testified that

> The second thing I remembered was that you had kited concerns about your foot dragging.   And so you were examined on Monday and then she [NP Kane] said I can't quite tell if anything's going on.   We are obviously concerned because you had a history of head injury multiple places and so we weren't sure whether you were embellishing or whether this was truly something going on.   So I said all right, I'll come out and I'll take a look and watch him and see if I can discern

33

anything.   That's what I remember.   And I remember coming out and taking a
look.

Dr. Greene Dep. (ECF No. 138-2, PageID.2263-2264).   When plaintiff asked Dr. Greene what

prompted her concern that he was embellishing, the doctor answered, "You were in prison.   You

were in jail." and that "The concern was did you actually have a serious medical condition."   *Id.*

at PageID.2264.   Dr. Greene later testified that "we did a further workup" on plaintiff because "I

had to be sure that you're safe.   So if you complained that your foot is dragging, the first thing we

say, is this really something going on or is this something where it's attention seeking."   *Id.* at

PageId.2265.

Plaintiff also takes issue with Dr. Greene's authority to treat patients at the Jail,

referring to NP Kane's affidavit from the case of *Nelson v. Balk*, 1:12-cv-694 (W.D. Mich), in

which NP Kane stated that at the time she worked for "Dr. Green," that the doctor saw inmates at

the jail, that she asked Dr. Green to examined a patient at the Jail with gum disease on April 6,

2010 and that Dr. Green did examine the patient on that date.   *See* NP Kane Aff. (ECF No. 141-

2).   Assuming that "Dr. Green" is defendant Dr. Greene, this affidavit does not create a genuine

issue of material fact with respect to the doctor's duties while plaintiff was at the Jail in 2013 and

2014.   In this regard, plaintiff also filed an affidavit from defendant Dr. Greene in a different case,

*Davis v. Greene*, 1:08-cv-582 (W.D. Mich.), in which the doctor mentioned that she had been the

Medical Director of St. Joseph County at one time, and in this capacity was available for on-call

coverage to assist the nurse at the Jail.   Dr. Greene Aff. (Nov. 18, 2008) (ECF No. 141-3,

PageID.3264-3265).   Regardless of her past positions, in this case, Dr. Greene made it clear that

she could not have personal contact with inmates in the Jail, i.e., citing the her contractual duty not

to have personal contact with inmates and performing only a "visual examination."

34

Based on this record, there is no evidence that Dr. Greene ignored plaintiff's condition and was deliberately indifferent to his serious medical needs. When NP Kane reported plaintiff's condition, Dr. Greene responded by referring plaintiff to an ophthalmologist and a neurologist, following up with the neurologist's recommendation for an MRI without contrast, and recommendation for an MRI with contrast.   Dr. Greene approved examinations and diagnostic testing which led to plaintiff's diagnosis of MS.   Such actions were responsive to plaintiff's medical needs; they do not reflect that "wantonness and obduracy" required to establish an Eight Amendment claim.   *See Whitley v. Albers*, 475 U.S. at 319.

Plaintiff's claim that Dr. Greene ignored his condition because she believed him to be embellishing symptoms does not establish the basis for a deliberate indifference claim.   The doctor was using her medical judgment to determine whether plaintiff was embellishing his symptoms to seek out attention or had actual symptoms.   In this regard, the neurologist engaged in the same process, questioning the extent of plaintiff's reported vision loss and noting that plaintiff's reported problems with his gait appeared to have "a significant component of embellishment."   *See* Dr. Sridahan Report at PageID.1976.

Finally, the fact that plaintiff was transferred from the Jail before he could undergo the second MRI does not reflect deliberate indifference on the part of Dr. Greene.   There appears no evidence that Dr. Greene intentionally scheduled plaintiff's second MRI for a time after his transfer.   Rather, this situation reflects the realities associated with managing a prisoner like plaintiff, who was subject to prosecution for state crimes while he was also a prisoner in the custody of the FBOP.   Accordingly, Dr. Greene's motion for summary judgment should be granted.

## V.    MDOC defendants' motion for summary judgment

### A.    Background

Unlike the St. Joseph County defendants and Dr. Greene, plaintiff's claims against MDOC defendants PA Boomershine and Corizon arose after plaintiff's MS diagnosis, when he was housed at the MDOC's Charles Egeler Reception Center ("RGC").   Plaintiff was in federal custody from February 11, 2014 to July 8, 2014, then released to the custody of the State of Michigan. Carlos Martinez Decl. (ECF No. 21-1, PageID.123).[8]   Plaintiff's claims against PA Boomershine arise from events which occurred from the time of plaintiff's arrival at RGC on July 8, 2014 until he was transferred to the Carson City Correctional Facility (DRF) on September 3, 2014.   Plaintiff's claims against Corizon arise from events which occurred from the time the MDOC took custody on July 8, 2014, until plaintiff allegedly received his first disease modifying therapy on May 18, 2015.

### B.    PA Boomershine

### 1.    Plaintiff's treatment history

Upon his transfer to the MDOC, plaintiff was housed at RGC, where all newly admitted inmates are temporarily housed upon initial incarceration pending the MDOC's placement of the prisoner in a permanent facility.   Boomershine Aff. (ECF No. 60-3, PageID.472).   The goal for permanent placement is ten business days.   Boomershine Dep. (ECF No. 123-2, PageID.1867).   However, placement may take several days or last up to several months.   Boomershine Aff. at PageID.472.   *See* MDOC Policy Directive 04.05.105 ¶QQ (eff. 12/29/2010) (which states in pertinent part "Intake processing shall normally be completed within

---

[8]  This declaration was filed in support of former defendant Dr. Gomez' motion to dismiss.

four weeks after arrival at the reception facility.   After intake processing is completed, the prisoner shall be transferred . . .").[9]

When PA Boomershine evaluated plaintiff for the first time on July 9, 2014, he did not have the benefit of plaintiff's pre-MDOC records and treated plaintiff based on information provided by plaintiff.   *Id.*; Boomershine Dep. at PageID.1845, 1851, 1858, 1860. Upon his arrival, plaintiff reported: that he had compromised vision since March 2014; that he was diagnosed with MS while he was housed in a federal prison in Kentucky; and that he was unable to walk or stand up without aid.   Boomershine Aff. at PageID.472-473. Boomershine considered plaintiff to be a reliable historian with respect to his medical history and MS diagnosis.   Boomershine Dep. at PageID.1845.

PA Boomershine stated: that he examined plaintiff; that he assessed plaintiff with fairly controlled MS; and that he maintained plaintiff's prescriptions by submitting requests for, among other medications, Lyrica (nerve pain medication) and Ampyra (a medication used to improve the walking ability of people with MS). Boomershine Aff. at PageID.472-473. PA Boomershine also ordered the following special accommodations: wheelchair accessible housing; a bottom bunk; ground floor; a shower chair; a wheelchair; at risk for heat related illness; attendant assistance for movement; and a handicapped table during meal times.   Boomershine Aff. at PageID.472-473.   Boomershine recalled at his deposition that plaintiff "had no indication that [he] [was] relapsing . . . [Plaintiff] seemed to be doing quite well and quite well informed and quite well able to let me know if [he] had not been."   Boomershine Dep. at PageID.1847.

---

[9] *See* http://www.michigan.gov/documents/corrections/04_01_105_342174_7.pdf

PA Boomershine testified that his course of action is a reflection of the short term goal of medical care at RGC:

Q. At RGC is your role that of a primary care provider?

A. Yes.

Q. And with RGC being a reception facility, is your role as a primary provider, primary care provider intended to be for the short term or the long term?

A. Short term.

Q. And can you roughly approximate what the short term is?

A. Our goal is ten business days. We exceed that sometimes, but at the time in question, we were still under Consent Decree. Ten business days we tried to have a turnaround where a patient would come in and leave.

Q. And because of that short term duration, does that mean that what you do as a primary care provider at RGC may be somewhat different from what the primary care provider at the next receiving facility would be?

A. Yes. Yes.

Q. So given all that, what is your role as primary care provider at RGC when you encounter a patient who comes in with a diagnosis of MS?

A. It's to establish the sense of how their state of health really is; to begin some very basic workup; some inquiry into their case and to satisfy any immediate needs such as with a person who arrives in a wheelchair. If they have a wheelchair; that they have a commode; that they are in a cell that can accommodate a wheelchair; that they have basic needs taken care of, and anything that would be anticipated to be managed over the short term we try to enter into. Long-term management generally is deferred, again, because we don't have the benefit of patients long-term like the real prison, so to speak.

Bomershine Dep at PageID.1867.

On July 10, 2014, PA Boomershine's requests for the non-formulary medications Lyrica and Ampyra were approved for 60 days by the MDOC's Chief Medical Officer ("CMO"), with the latter noting that the indication for these medications would have to be reviewed at

plaintiff's permanent facility.   Boomershine Aff. at PageID.473.   PA Boomershine prescribed

Ampyra and Lyrica accordingly.   *Id*. at PageID.472-473.

On July 18, 2014, plaintiff submitted a request for Tysabri because he believed it

was the appropriate medication to treat his MS symptoms.   *Id*. at PageID.474.   Plaintiff's kite

stated:

> I have Multiple Sclerosis.   It's aggressive in my case and much of the
> disease is in my cervical cord.   I need disease modifying therapy in the form of a
> monthly infusion of "Tysabri."   I have copies of doctors orders with me or you can
> contact her for copies.   Dr. Melissa Smith, Neurologist [phone number and
> address]
> .

Kite (July 18, 2014) (ECF No. 140-3, PageID.3208).   PA Boomershine stated that he does not

review or process a patient's request for care; those are screened and responded to by the nursing

staff.   *Id*. at PageID.474.   MDOC records reflect this request sent to RN Mitchell as follows:

"States needs monthly infusion of Tysabri for MS."   Plaintiff's Medical Records (ECF No. 62-1,

PageID.590).   On July 31, 2014, plaintiff's request was addressed by RN Howard and medical

provider (MP) Janak R. Bhavsar, M.D. as follows:

> This nurse called inmate out to discuss kite being placed with complaints of
> wanting Tysabri medication for multiple sclerosis. This nurse spoke with MP and
> MP informed this nurse that inmate would not be receiving medication at this time
> that he would follow up at his receiving site. Inmate was not receiving medication
> prior to incarceration.

Medical Record at PageID.596.

While at RCG, an optometrist examined plaintiff on July 23, 2014, and ordered

treatment of plaintiff's optic neuritis.   *Id*. at PageID.498.

On August 22, 2014, PA Boomershine saw plaintiff for an MS follow-up, at which

time plaintiff reported that he was doing fairly well. Boomershine Aff. at PageID.475.

Boomershine determined to continue the current plan of care, but also referred plaintiff to a physician for further evaluation and advice regarding measures to improve plaintiff's mobility, whether plaintiff needed a neurologist consultation, or additional medications for the MS. *Id.*

On August 26, 2014, Dr. Patricia Schmidt saw plaintiff for his MS condition. Bommershine Aff. at PageID.475. Some of plaintiff's previous medical records were available at this time, with the doctor noting "Old records reviewed and demonstrate lesions in the Cspin are consistent [sic] with history of multiple sclerosis." Medical Records at PageID.599. Plaintiff was wheelchair bound and "has had a rapid progression of his disease in the past 18 months." *Id.*

On August 27th, the optometrist examined plaintiff again and assessed him with inflammation of the optic nerve and significant field loss. *Id.* at PageID.497, 521.

PA Boomershine scheduled a follow-up chronic care appointment the next month, but he did not see plaintiff due to plaintiff's transfer to DRF on September 3, 2014. Boomershine Aff. at PageID.476.

### 2.    PA Boomershine's motion for summary judgement

PA Boomershine seeks summary judgment on plaintiff's claim that he was deliberately indifferent to plaintiff's serious medical needs. PA Boomershine does not dispute that plaintiff's MS presented a serious medical need. *See* MDOC Defendants' Brief (ECF No. 123, PageID.1786). However, Boomershine contends that he was not deliberately indifferent to this serious medical need during the approximately two months plaintiff was incarcerated at RGC.

In his response, plaintiff contends that PA Boomershine met the subjective element of the deliberate indifference claim "when he denied [plaintiff] the recommended treatment and

40

access to a neurologist."   Plaintiff's Response (ECF No. 140, PageID.2550). The basis of

plaintiff's claim is that he was not given Tysabri as recommended by FBOP physician Dr. Melissa

Smith and that he did not commence disease modifying therapy, which plaintiff identified as "in

the form of weekly Avonox [sic]" until March 18, 2015.[10]   A partial record from Dr. Smith from

June 12, 2014, includes diagnoses for: "1. Multiple sclerosis, relapsing-remitting; 2. H/O optic

neuritis; and 3. Spastic paraplegia secondary to multiple sclerosis."   Dr. Smith notes (ECF No.

140-2, PageID.2868). The doctor also stated a plan as follows:

> Would recommend initiating disease modifying therapy to help protect from further MS attacks and disability as soon as possible[.]

> He is in federal custody and will be transferring to state of Michigan in July. In his current situation and with his extent of disease I feel he would be a good candidate for Tysabri.   This would need to be done as a monthly infusion either with an approved infusion nurse coming to the correctional facility, or he being transported monthly to an approved outpatient infusion center. This will require close monitoring and he must have access to a neurologist prior to initiating Tysabri as well as routine follow up.

> Prior to starting Tysabri, he will need a JC Virus Antibody profile. This must be done at an approved lab and could be done before he is moved to Michigan. KDMC lab is an approved facility and it must be ordered exactly as JC Virus Antibody profile.

*Id*. at PageID.2868-2869.

The medical records reflect that PA Boomershine did not ignore plaintiff's

diagnosis of MS. PA Boomershine provided short term care for plaintiff during the eight weeks

plaintiff was at RGC.   While plaintiff requested Tysabri infusions, he was not on that medication

when he arrived at RGC.   During that time, plaintiff saw an optometrist and a doctor for symptoms

---

[10] The Court notes that plaintiff's complaint alleged that his therapy did not commence until May 18, 2015.   The summary of MDOC records, *infra*, reflects that plaintiff began intravenous Avonox on March 18, 2015, and that Tysabri is prescribed only where patients fail to respond to first-line medications such as Avonex.

related to MS.  PA Boomershine's conduct does not exhibit the "wantonness and obduracy" which typify the subjective element of a deliberate indifference claim.  *See Whitley v. Albers*, 475 U.S. at 319.  Understandably, plaintiff wanted to start long term disease modifying   treatment as soon as possible; any of us would if we were in his condition.   Nevertheless, plaintiff was only temporarily incarcerated at RGC.  Plaintiff's long term care was addressed when he transferred to a long term correctional facility.  *See* discussion, *infra*.  Accordingly, PA Boomershine's motion for summary judgment should be granted.

### C.    Corizon

### 1.    Plaintiff's treatment history

A summary of plaintiff's remaining treatment history is set forth in the affidavit of Jeffrey Bomber, D.O., the State Medical Director for Corizon in the State of Michigan.  *See* Bomber Aff. (ECF No. 60-2, PageID.445).   The Court has outlined that summary from the date that plaintiff was transferred to DRF (September 3, 2014) through the date that plaintiff alleged that he "began Disease Modifying therapy for the first time" (May 18, 2015).

**September 2014**.  Plaintiff transferred to DRF on the 3rd.  Dr. Holmes saw plaintiff on the 8th to fill out forms for the MDOC's Pain Management Committee ("PMC") to obtain a prescription of Lyrica.   Dr. Holmes reviewed records from plaintiff's federal incarceration including an MRI from May 14, 2014 showing MS affecting plaintiff's cervical and thoracic cord and July 12, 2014 neurology consultation notes recommending the drug Tysabri. Dr. Holmes examined plaintiff, noted some lower extremity atrophy, and noted that he would consider Tysabri infusions.  Plaintiff's Ampyra prescription was approved for one year.   The PMC approved plaintiff's Lyrica on the 17th.   Bomber Aff. at PageID.448-449.

42

**October 2014**.  Dr. Holmes saw plaintiff for a follow up on the 3rd.  Plaintiff reported the Lyrica was effective but complained of back pain, foot pain, foot shaking, and blood in his stool.   Dr. Holmes ordered an x-ray of Mr. Lumbard's abdomen (to assess for abnormalities causing blood in stools), urine and blood tests, and a follow-up visit.   The x-ray was performed on the 6th.   The impression was normal, and there was no evidence of mechanical obstruction, a mass, or a foreign body. Dr. Holmes examined plaintiff on the 9th.   While plaintiff reported weight loss, the doctor noted that his weight appeared to show an increase.   Dr. Holmes called Dr. Melissa Smith, the neurologist who saw plaintiff in April and June 2014. Dr. Holmes noted Dr. Smith's note mentioned starting Tysabri but that JC Virus DNA and PCR tests were needed first. The tests were later performed and the results were negative, but plaintiff was unsure of the significance of the results.   Dr. Holmes ordered a follow-up visit in two months to continue management of MS and evaluation for clinical indication for Tysabri.   Dr. Holmes saw plaintiff on the 31st for a follow up on his MS and further evaluation of plaintiff's request for Tysabri. Plaintiff was able to get out of his wheelchair but was unable to stand up on his own and had dramatic tremor and shaking in his legs.   Dr. Holmes reordered Lyrica and scheduled visits in April 2015 for further review of the need for Tysabri.   Bomber Aff. at PageID.449-450.

**December 2014**.   A nurse saw plaintiff on the 2nd for complaints of worsening MS symptoms, i.e., new upper extremity symptoms of tingling in his arms and hands and weakness in his fingers. The nurse examined plaintiff and noted his bilateral upper extremity strength was somewhat weakened.   Dr. Holmes saw plaintiff for the MS on the 15th.   The doctor noted that Dr. Smith relayed a message that plaintiff was a good candidate for Tysabri treatment, indicating he had tested negative for exposure to the virus associated with PML, a potential complication of

Tysabri.   Dr. Holmes noted that plaintiff had atrophy of his lower extremities, decreased upper extremity strength, lower extremity atrophy, and tremor, and was unable to walk.   The doctor requested a neurology consultation to manage plaintiff's MS treatment.   Dr. Holmes' request for a neurology consultation was approved on the 15th, with an appointment for January 8, 2015. The doctor also submitted a request for Tysabri to the MDOC Chief Medical Officer ("CMO"); however, the record reflects no response.   *Id*. at PageID.450-451.   Dr. Bomber had no explanation for the decision, but stated that due to the risks associated with Tysabri, it would be appropriate to wait for a neurologist's recommendation.[11]

**January 2015**.   A nurse saw plaintiff on the 2nd for complaints of migraines and numbness and weakness in his right hand.   The nurse noted that plaintiff was able to follow her commands, answered questions appropriately, and that his grips were equal and strong. She referred plaintiff to a provider.   Dr. Holmes saw plaintiff on the 15th, at which time plaintiff stated that his neurology consult had been cancelled.   The doctor assessed plaintiff with poorly controlled MS and ordered a follow-up appointment.   Bomber Aff. at PageID.452.

**February 2015**.   Dr. Holmes saw plaintiff on the 3rd and noted that medical staff were awaiting the status of his neurology consult.   Plaintiff reported pain in front of his right ear and pain with chewing. Dr. Holmes noted the movement of his jaw felt smooth and symmetric and he felt no nodes on his neck and thyroid. The doctor prescribed Naprosyn and ordered a follow-up appointment for plaintiff's temporomandibular joint disfunction ("TMJ") and neurology consult,

---

11 Dr. Bomber explained, "Tysabri is a second-line medication that has been linked to PML, a potentially fatal complication. Although Mr. Lumbard tested negative for the virus associated with PML, Tysabri is nevertheless riskier than first-line medications such as Avonex. Because of this risk, Tysabri is prescribed only where patients fail to respond to first-line medications; i.e. when a patient taking a first-line disease-modifying medication has an MS relapse, characterized by an exacerbation or hospitalization. It was appropriate to wait for a neurologist's evaluation and recommendation before prescribing Tysabri.   Bomber Aff. at PageID.451.

and ordered an x-ray of his jaw.   Plaintiff had the jaw x-ray on the 6th, which showed no abnormalities. The doctor saw plaintiff on the 23rd for a follow-up on both the MS and TMJ.   The doctor assessed plaintiff with poorly controlled MS, and ordered a follow-up chronic care clinic and an optometry appointment. Bomber Aff. at PageID.452-453.

**March 2015**.   A neurologist examined plaintiff on the 5th. Plaintiff stated that he started experiencing vision loss followed by a tingling sensation in his left foot and gait imbalance. The neurologist noted the history as provided by plaintiff: plaintiff underwent testing in March 2014 which suggested MS; he saw a neurologist who recommended Tysabri but he was not started on any MS medication; he reported receiving Ampyra in September 2014 and noted some improvement; he also reported improvement with Lyrica which he started in December 2014; however, he had worsening tremors over the past year.   The neurologist assessed plaintiff's MS and gait abnormality as deteriorated, note that plaintiff most likely had relapsing-remitting MS and prescribed Avonex to prevent relapses.   The neurologist also recommended a follow-up brain MRI, gait training (a type of physical therapy), and a follow-up in six months if plaintiff reported new symptoms.[12]

On the 6th, PA Brent Simon reviewed the neurologist's note, requested Avonex, ordered a follow-up appointment and noted that he would request physical therapy for plaintiff's balance and gait issues.   The Avonex and physical therapy were approved.   Dr. Bomber stated that "I am unaware of why the provider did not request a brain MRI," noting that MRI's were

---

[12] In his affidavit, Dr. Bomber stated that "Mr. Lumbard incorrectly described his medication history to the neurologist. His records indicate he was prescribed Ampyra and Lyrica upon intake to the MDOC in July 2014 and that these medications were renewed upon intake and again upon transfer to MSP."   Bomber Aff. (ECF No. 60-2, PageID.453).

approved in August 2015 and March 2016.   Plaintiff's Avonex commenced on the 18th, when he was given an injection and ordered nausea medication. Dr. Holmes saw plaintiff on the 23rd to assess his response to Avonex.   The doctor noted that plaintiff had large group tremors in his lower extremities, that he was unable to walk or bear weight, and assessed him with poorly controlled MS. The doctor noted he would continue to follow plaintiff closely and ordered a follow-up provider visit to assess his response to Avonex.   Bomber Aff. at PageID.453-454.

**April 2015**.   On the 6th, plaintiff saw a physical therapist for lower extremity weakness and to develop a home exercise plan.   The therapist assessed plaintiff's rehabilitation potential as poor but noted that plaintiff was motivated to perform exercises to slow progression of his MS.   The therapist reviewed a home exercise plan with plaintiff, ensured he was able to perform the exercises, and provided him written instructions with pictures of the recommended exercises.   Dr. Holmes saw plaintiff on the 14th to assess his progress with Avonex.   Plaintiff reported he had not noticed any obvious improvement and complained of abdominal pain.   The doctor noted no abdominal tenderness, observed obvious lower extremity atrophy and cachexia (weakness and wasting due to severe chronic illness), provided education regarding plaintiff's plan of care and ordered a follow-up appointment.   On the 24th, Dr. Holmes saw plaintiff for a follow-up, at which time plaintiff complained of chest and foot pain.   The doctor noted no cardiovascular abnormalities, assessed plaintiff with poorly controlled MS, and ordered a follow-up appointment. A nurse saw plaintiff for a chronic care visit on the 30th, at which time her reported acne on his face since starting Avonex.   The nurse noted plaintiff possessed knowledge regarding disease management and reported adherence to his medication management. The nurse also discussed skin

care, stretching exercises, and diet.    Plaintiff reported he was doing stretching exercises according to the doctor's instructions.    Bomber Aff. at PageID.454-456.

**May 2015**. Dr. Holmes saw plaintiff on the 12th for a follow-up.    Plaintiff reported his spasms were worse at night and experienced painful cramps.    He also requested a fan. Upon examination, plaintiff did not appear to be in acute distress but exhibited thigh atrophy and tremor in his thighs. Dr. Holmes ordered labs, a chart review, and a follow-up examination. The doctor also requested Baclofen (a muscle relaxant) for plaintiff's spasms and a fan for the hot weather. The MDOC CMO approved Baclofen but deferred the fan as not medically necessary. Dr. Holmes ordered the Baclofen on the 13th.    The doctor saw plaintiff for a follow-up on the 28th.    At that time, plaintiff reported Avonex did not help him because of its flu-like side effects. Dr. Holmes noted plaintiff had obvious lower extremity atrophy and dramatic hyperreflexia (a condition in which the nervous system overreacts to stimuli) of the lower extremities.    The doctor talked to plaintiff regarding his plan of care, scheduled a follow-up appointment, and requested a three-month outside neurology follow-up.    Dr. Holmes noted plaintiff had some troubling side effects to the Avonex and wanted the neurology specialist to review the medication and the possibility of Tysabri.    The neurology consult was approved that day.    Plaintiff saw an optometrist on the 28th, who noted that plaintiff had an extremely limited visual field and noted that he would continue to monitor the situation and follow-up in six months.    Bomber Aff. at PageID.456.

## 2.    Corizon's motion for summary judgment

Plaintiff cannot establish a § 1983 claim against Corizon unless he can prove that he suffered injury because Corizon's employees violated his Eighth Amendment rights pursuant to official policy. *See Street v. Corrections Corporation of America*, 102 F.3d 810, 817-18 (6th

Cir. 1996) (the *Monell* bar to *respondeat superior* liability applies to private corporations). Defendants point out that plaintiff failed to allege a single policy, practice or procedure of Corizon which was a "moving force" behind his alleged deprivation of rights. *See Searcy*, 38 F.3d at 286. While plaintiff's complaint named Corizon as a defendant, *see* Compl. (ECF No. 1, PageID.3), his only allegation was, "Despite receiving a definitive diagnosis and recommendations from Dr. Melissa Smith, the defendants, Federal Bureau of Prisons, Dr. Gomez, Mr. Boomershine (PA), Michigan Department of Corrections, and Corizon continued to refuse Plaintiff any form of disease modifying therapy."   Compl. at PageID.14.   In short, plaintiff did not allege that Corizon had a policy, practice or procedure which violated his Eighth Amendment rights.   For that reason alone, Corizon's motion should be granted.

Furthermore, assuming that plaintiff *had* alleged that Corizon had some policy which adversely affected the medical treatment provided to him, the medical record summarized above reflects that plaintiff had continuing medical care at the MDOC from the time he left RGC through May 18, 2015, and that he received a disease modifying therapy (Avonex) on March 18, 2015. Finally, even if the Court accepts Dr. Potts' affidavit critical of plaintiff's treatment by Corizon, that affidavit is insufficient to establish deliberate indifference. The affidavit does not identify Corizon's policies and, at most, would support a claim for negligence and medical malpractice by the individuals who provided medical treatment.   Accordingly, Corizon's motion for summary judgment should be granted.

## VI.    Recommendation

For the reasons set forth above, I respectfully recommend that by St. Joseph County Sheriff's Department, Sheriff Balk, Undersheriff Lillywhite, Capt. Schuler, and NP Kane's motion for dismissal on the pleadings, or alternatively, for summary judgment (ECF No. 122) be **GRANTED**.

I further recommend that PA Boomershine and Corizon's motion for summary judgment (ECF No. 123) be **GRANTED**.

I further recommend that Dr. Greene's motion for summary judgment (ECF No. 127) be **GRANTED**.

I further recommend that plaintiff's motion for leave to file an amended complaint (ECF No. 139) be **DENIED**.

I further recommend that this action be **TERMINATED**.


Dated: March 13, 2018                              /s/ RAY KENT
                                                   United States Magistrate Judge


**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.   All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.   *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).